**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED by _____ D.C.

NOV 1 5 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

UNITED STATES *ex. rel.*
PAUL MEYER,

         **Relator,**

vs.

HEALTH MANAGEMENT ASSOCIATES
INC., BARTOW HMA, INC., BRANDON
HMA, LLC, CLARKSDALE HMA, LLC,
DURANT HMA, LLC, GAFFNEY HMA, LLC,
HAINES CITY HMA, LLC, KEY WEST HMA,
LLC, LONE STAR HMA, L.P., LOUISBURG
HMA PHYSICIAN MANAGEMENT, LLC,
MARATHON HMA, LLC, MERIDIAN HMA,
LLC, MIDWEST REGIONAL MEDICAL
CENTER, LLC, NAPLES HMA, LLC,
NATCHEZ COMMUNITY HOSPITAL, LLC,
POPLAR BLUFF REGIONAL MEDICAL
CENTER, LLC, PORT CHARLOTTE HMA,
LLC, PUNTA GORDA HMA, LLC, ROSE
CITY HMA, LLC, HMA SANTA ROSA
MEDICAL CENTER, INC., SEBRING
HOSPITAL MANAGEMENT ASSOCIATION,
LLC, VAN BUREN CENTRAL BUSINESS
OFFICE, LLC, and WINDER HMA, LLC,

         **Defendants.**

_____/

CASE NO.

**11-62445** cv-Kmw

<u>**FILED IN CAMERA
AND UNDER SEAL**</u>

<u>**JURY TRIAL DEMANDED**</u>

**COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES
UNDER THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3732**

       COMES NOW, the **United States of America**, *ex. rel.* **Paul Meyer** ("Mr. Meyer" or

"Relator"), by and through the undersigned attorneys on behalf of the United States of America

("United States") and brings this action against Defendant, **Health Management Associates,**

**Inc.** ("HMA") and Hospital Defendants (collectively "HMA Hospitals"), **Bartow HMA, Inc.**

d/b/a Bartow Regional Medical Center, **Brandon HMA, LLC** d/b/a Crossgates River Oaks

Hospital, LLC ("Crossgates") f/k/a Rankin Medical Center "(Rankin Medical"), **Clarksdale**

HMA, LLC d/b/a Northwest Mississippi Regional Medical Center, **Durant HMA, LLC** d/b/a Medical Center of Southeastern Oklahoma, **Gaffney HMA, LLC**, d/b/a Upstate Carolina Medical Center, **Haines City HMA, LLC** d/b/a Heart of Florida Regional Medical Center, **Key West HMA, LLC** d/b/a Lower Keys Medical Center, **Lone Star HMA, L.P.** d/b/a Dallas Regional Medical Center, **Marathon HMA, LLC** d/b/a Fisherman's Hospital, **Meridian HMA, LLC** d/b/a Riley Hospital, **Midwest Regional Medical Center, LLC**, **Naples HMA, LLC** b/b/a as Physicians Regional Medical Center – Collier Boulevard and Physicians Regional Medical Center – Pine Ridge, **Natchez Community Hospital, LLC**, **NC Louisburg HMA Physician Management, LLC** d/b/a Franklin Regional Medical Center, **Poplar Bluff Regional Medical Center, LLC** d/b/a Poplar Bluff Regional Medical Center, **Port Charlotte HMA, LLC** d/b/a Peace River Regional Medical Center, **Punta Gorda HMA, LLC** d/b/a Charlotte Regional Medical Center, **Rose City HMA, LLC** d/b/a Lancaster Regional Medical Center, **HMA Santa Rosa Medical Center, Inc.** d/b/a Santa Rosa Medical Center, **Sebastian Hospital, LLC** d/b/a Sebastian River Medical Center, **Sebring Hospital Management Association, LLC** d/b/a Highlands Regional Medical Center, **Van Buren HMA Central Business Office, LLC** d/b/a Crawford Memorial Hospital, and **Winder HMA, LLC** d/b/a Barrow Regional Medical Center (collectively referred to as the "HMA Defendants"), for money damages and civil penalties arising out of Defendants' violation of the False Claims Act, 31 U.S.C. §§ 3729-3732. Relator alleges as follows:

## THE PARTIES

1.    *Qui tam* Relator, **Paul Meyer**, is a citizen of the United States and resident of the State of Florida, residing in Broward County, Florida. Mr. Meyer is an approximately 30 year veteran employee of the Federal Bureau of Investigation, having spent his last three years with that agency heading up its Medicare fraud unit in Southeastern Florida. Following his retirement

from the FBI in early 2006, Mr. Meyer became an employee of HMA in its Corporate Compliance Department in Naples, Florida.

      2.      The **United States of America** funds the provision of medical care, including services for eligible citizens through its Medicare program.

      3.      Defendant, **Health Management Associates, Inc.,** is a Delaware corporation doing business in Florida and in several other states, with its principal place of business in Naples, Florida. HMA owns and operates approximately sixty-five (65) hospitals throughout the United States. HMA owns and/or operates approximately twenty-two (22) hospitals that are located in Florida and, at all times pertinent hereto, was responsible for the operations of the HMA Hospitals named as Defendants herein.

      4.      Defendant, **Bartow HMA, Inc.,** is a Florida Limited Liability Company doing business under the fictitious name Bartow Regional Medical Center, with its principal place of located at HMA's business address in Naples, Florida.

      5.      Defendant, **Brandon HMA, LLC**, is a Mississippi Limited Liability Company doing business as Crossgates River Oaks Hospital, LLC and Rankin Medical Center. Upon information and belief, Defendant's principal place of business is located at HMA's address in Naples, Florida.

      6.      Defendant, **Clarksdale HMA, LLC**, is a Mississippi Limited Liability Company doing business as Northwest Mississippi Regional Medical Center. Upon information and belief, Defendant's principal place of business is located at HMA's address in Naples, Florida.

      7.      Defendant, **Durant HMA, LLC**, is an Oklahoma Limited Liability Company. Upon information and belief, Defendant's principal place of business is located at HMA's address in Naples, Florida.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

8.     Defendant, **Gaffney HMA, LLC**, is a South Carolina Limited Liability Company with its principal place of business located in South Carolina. Upon information and belief, Defendant's principal place of business is located at HMA's address in Naples, Florida.

9.     Defendant, **Haines City HMA, LLC**, is a Florida Limited Liability Company doing business as Heart of Florida Regional Medical Center with its principal place of business located at HMA's address in Naples, Florida.

10.     Defendant, **Key West HMA, LLC**, is a Florida Limited Liability Company doing business as  Lower Keys Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

11.     Defendant, **Lone Star HMA, L.P.**, is a Delaware Limited Partnership which operates a hospital in Mesquite, Texas, with its principal place of business located at HMA's address in Naples, Florida.

12.     Defendant, **Marathon HMA, LLC**, is a Florida Limited Liability Company doing business as Fisherman's Hospital, with its principal place of business located at HMA's address in Naples, Florida.

13.     Defendant, **Meridian HMA, LLC**, is a Mississippi Limited Liability Company doing business as Riley Hospital, with its principal place of business located in Mississippi.

14.     Defendant, **Midwest Regional Medical Center, LLC**, is an Oklahoma Limited Liability Company with its principal place of business in Oklahoma City, Oklahoma.

15.     Defendant, **Naples HMA, LLC**, is a Florida Limited Liability Company doing business as Physicians Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

16.     Defendant, **Natchez Community Hospital, LLC**, is a Mississippi Limited Liability Company with its principal place of business in Mississippi.

4

17.     Defendant, **NC Louisburg HMA Physician Management, LLC**, is a North Carolina Limited Liability Company doing business as Franklin Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

18.     Defendant, **Poplar Bluff Regional Medical Center, LLC**, is a Missouri Limited Liability Company doing business as Poplar Bluff Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

19.     Defendant, **Port Charlotte HMA, LLC**, is a Florida Limited Liability Company doing business as Peace River Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

20.     Defendant, **Punta Gorda HMA, LLC**, is a Florida Limited Liability Company doing business as Charlotte Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

21.     Defendant, **Rose City HMA, LLC**, is a Pennsylvania Limited Liability Company doing business as Lancaster Regional Medical Center, with its principal place of business in Pennsylvania.

22.     Defendant, **HMA Santa Rosa Medical Center, Inc.**, is a Florida corporation doing business as Santa Rosa Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

23.     Defendant, **Sebastian Hospital, LLC**, is a Florida Limited Liability Company doing business as Sebastian River Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

24.     Defendant, **Sebring Hospital Management Association, LLC,** is a Florida Limited Liability Company doing business as Highlands Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

25.     Defendant, **Van Buren HMA Central Business Office, LLC**, is an Arkansas Limited Liability Company doing business as Crawford Memorial Hospital. Upon information and belief, Defendant's principal place of business is located at HMA's address in Naples, Florida.

26.     Defendant, **Winder HMA, LLC**, is a Georgia Limited Liability Company doing business as Barrow Regional Medical Center, with its principal place of business located at HMA's address in Naples, Florida.

## JURISDICTION AND VENUE

27.     This is an action to recover damages and civil penalties on behalf of the United States arising out of false claims and records presented by the HMA Defendants to the United States. This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et. seq.,* which provides that the United States District Courts shall have exclusive jurisdiction.

28.     This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

29.     Jurisdiction also is proper under 31 U.S.C. § 3730(e) as Relator is the original source of the information upon which the claims set forth herein are based. His knowledge of the practices and actions of the HMA Defendants was gained by his own efforts as an employee in the Corporate Compliance Department of Health Management Associates, Inc.

30.     Venue is appropriate in this District as one or more of the Defendants can be found in, resides in and/or transacts business in this judicial district.

## APPLICABLE GOVERNMENTAL HEALTH PROGRAMS, STATUTES AND REGULATIONS

### I.     The Medicare Program – Title XVIII of Social Security Act, 42 U.S.C. §§ 1395-95cc

31.     The Medicare Program was enacted by Congress in 1965 to pay for the costs of certain health services. Medicare benefits are available based on age, disability and to those

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

afflicted with end-stage renal disease. Title XVIII of the Social Security Act; *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facilities and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including the Defendant Hospitals herein and HMA, their owner and operator, derive a substantial portion of their revenue from the Medicare Program.

32.     Medicare provides reimbursement to provider hospitals in several ways depending on the status of the patient as either inpatient or outpatient.

33.     Hospital outpatient services are reimbursed on the Hospital Outpatient Prospective Payment System. All such services are classified into groups called Ambulatory Payment Classifications ("APCs"). Services in each APC are similar clinically and in terms of the resources they require. A payment rate is established for each APC. Depending on the services provided, hospitals may be paid for more than one APC for an encounter.

34.     Hospital inpatient services are reimbursed under the Inpatient Prospective Payment System. This is a system developed for Medicare to classify hospital cases into one of approximately 500 groups, also referred to as DRGs, which are expected to have similar hospital resource use. DRGs are assigned by a "grouper" program based on ICD diagnoses, procedures, age, sex, and the presence of complications. DRGs have been used since 1983 to determine how much Medicare pays the hospital, since patients within each category are similar clinically and are expected to use the same level of hospital resources. DRGs may be further grouped into Major Diagnostic Categories ("MDCs"). The process of forming the DRGs was begun by dividing all possible principal diagnoses into 25 mutually exclusive principal diagnosis areas called MDCs. Surgical patient cases are further defined based on the precise surgical procedure performed while medical patients are defined based on the precise principal diagnosis for which

7

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

they are admitted to the hospital. Medical patients are assigned to DRGs based upon their principal diagnosis, as well as their age, sex, discharge status or the presence of complications.

35.     Hospital providers are required by the Medicare conditions of participation to ensure that services provided to Medicare beneficiaries are, in fact, medically necessary and are required to assess the medical necessity of inpatient admissions. The United States has urged hospital providers to establish compliance programs to insure that they are not in violation of programs requirements and hospital providers are required to establish Utilization Review committees. 42 C.F.R. § 482.30.

36.     In order for an admission to be considered medically necessary under the Medicare program, the patient must have a condition requiring treatment that can only be provided in the inpatient setting. In this regard, the condition and treatment should be clearly documented in the medical record. If the patient can safely receive treatment in a less intensive setting, such as outpatient observation, the patient must not be admitted as an inpatient into a hospital. Medicare and other government programs only pay for those services that meet appropriate medical necessity standards. Medicare defines medical necessity as reasonable and necessary services. Providers may not bill for services that do not meet the applicable standards set by Medicare for medical necessity.

37.     If a physician is unsure about the need for an admission or feels that a patient will respond rapidly to treatment, the patient should be placed in outpatient observation. If the physician believes that a patient is acute and requires admission because of this acute condition, these facts should be clearly documented in the medical record.

38.     The use of outpatient observation instead of inpatient admission is appropriate when the need for inpatient admission cannot be medically determined and when additional time is needed to evaluate the patient or when the physician believes the patient will respond rapidly

8

to treatment. Medicare coverage for outpatient observation is limited to a 48 hour period unless the fiscal intermediary grants an exception.

39.     Observation services are defined by the Centers for Medicare and Medicaid Services ("CMS") as follows: those services furnished by a hospital on its premises, including the use of a bed and at least periodic monitoring by a hospital's nursing or other staff, which are reasonable and necessary to evaluate an outpatient's condition or determine the need for a possible inpatient admission. The purpose of observation is to evaluate and treat a patient's medical condition to determine if there is a need for further treatment or a need for inpatient admission. CMS Manual, Pub. 100-02. Observation is an outpatient status and documentation is critical. A physician's order must specify "place in observation" and be signed, dated and timed.

40.     The time to commence billing is based on the file entries as to when the patient is placed in the observation bed to initiate observation services and ends with the time of the actual hospital discharge pursuant to a physician's discharge. When a patient has been in observation status for 24 hours, documentation in the progress notes must include the need to continue observation status with a plan for discharge within the next 12 to 24 hours or the need to convert the patient to inpatient, documenting the medical necessity for admission or medical stability for discharge and a plan for follow up as needed.

41.     Medical necessity for admission must be met and documented at the time of conversion from observation to inpatient status. Only physicians can change admission status to inpatient prior to discharge. Conversions can also be made from inpatient to observation status prior to discharge if a physician determines that the inpatient admission is unnecessary or the original order was ambiguous and the physician clarifies that original order. Any change in admission status must be supported by the contemporaneous medical record (physician notes and orders). Continuous monitoring, such as telemetry, can be provided in an observation or inpatient

9

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

status. The physician must consider the overall severity of illness and intensity of services in determining admission status rather than any single or specific intervention.

42.     Hospitals can use specialty inpatient areas (including CCU or ICU) to provide observation services. The level of care, not physical location of the bed, dictates the admission status.

43.     Following the discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. These hospitals submit patient-specific claims for interim payments on a CMS Form UB-04 (formerly UB-92). As a prior condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report." These Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services provided to Medicare beneficiaries. After the conclusion of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395G(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1). At all times relevant to this complaint, the Defendant hospitals were required to submit Hospital Cost Reports to their fiscal intermediaries.

44.     The Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total

determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

45.    Where patients are improperly admitted as inpatients rather than as outpatients, the DRG and outlier reimbursements and cost reports are unlawfully increased to the financial advantage of the provider hospitals.

46.    Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator. The Hospital Cost Report specifically warns that misrepresentation or falsification of any information contained in the Cost Report may be punishable by criminal, civil and administrative action, fine and/or imprisonment. Hospitals are required to be familiar with the laws and regulations governing the Medicare program, including requirements relating to the completion of Cost Reports.

47.    A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary, a duty specifically created by 42 U.S.C. §1320a-7b(a)(3).

**II.    The Stark Statute, 42 U.S.C. § 1395nn**

48.    The Stark Statute ("Stark"), enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn, has two basic prohibitions - - a referral prohibition and a billing prohibition. The Stark Statute (1) prohibits a physician or immediate family member of a physician who has a financial relationship with a hospital from making a referral to that entity for the furnishing of designated health services and (2) prohibits a hospital from presenting or causing to be presented a claim or bill to any individual, third party payor or other entity for designated health services furnished pursuant to a prohibited referral. 42 U.S.C. § 1395nn. The regulations implementing 42

11

U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service performed under a prohibited referral must refund all collected amounts on a timely basis. 42 C.F.R. § 411.353.

49.     In enacting Stark, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, or of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

50.     Congress enacted Stark in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

51.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services:" (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

52.     Stark is a strict liability statute. If a prohibited relationship does not meet an exception or if an employment agreement is void for failing to meet an exception, every referral made by the implicated physician from the referring employee physician to the DHS entity is subject to prohibition.

53.     Recognizing that hospitals and physicians often lease space from each other, thereby creating a financial relationship between the parties, Congress established an exception to Stark for space rental arrangements. Stark provides that "payments made by a lessee to a lessor for the use of premises" do not give rise to a financial relationship, *provided that seven conditions are met*: (1) The lease must be in writing, signed by the parties to the lease, and must specify the premises covered by the lease; (2) The term of the lease must be for at least one year; (3) The space leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease; (4) The space leased is used exclusively by the lessee, unless the leased space includes common areas, in which case the lease payments may be based on the lessee's pro rata share of expenses for the common space; (5) The lease charges must be set out in advance, must be consistent with fair market value and must not be determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties: (6) The terms of the lease must be commercially reasonable even if no referrals were made between the parties; and (7) The lease must meet such other requirements as CMS may impose by regulation as needed to protect against program or patient abuse. 42 U.S.C. § 1395nn(e)(1)(A).

54.     The regulations implementing Stark generally track the statute with respect to the space rental exception but additionally provide that a holdover month-to-month rental for up to six months immediately following an agreement of at least one year that otherwise meets the

conditions of the exception will satisfy the exception, providing that the holdover rental is on the same terms and conditions of the immediately preceding agreement. 42 C.F.R. § 411.357.

55.     Similar to the treatment of space rentals, Stark and the implementing regulations provide an exception for equipment rental arrangements, recognizing that it is common for physicians to lease equipment from and to entities to which they make designated health services referrals *provided that seven conditions are met*: (1) The lease must be in writing, signed by the parties, and specify the equipment covered by the lease; (2) The term of the lease must be for at least one year; (3) The equipment leased may not exceed that which is reasonable and necessary for the legitimate business purpose of the lease; (4) The equipment leased is used exclusively by the lessee; (5) The lease charges are set out in advance, are consistent with fair market value and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties; (6) The terms of the lease must be commercially reasonable even if no referrals were made between the parties; and (7) The lease must meet such other requirements as CMS may impose by regulation as needed to protect against program or patient abuse. 42 U.S.C. § 1395nn(e)(1)(B).

56.     As with the space leases, the regulations expand on the statutory provisions by providing that a holdover month-to-month rental for up to six months immediately following an agreement of at least one year that otherwise meets the conditions of the exception will satisfy the exception, providing that the holdover lease is on the same terms and conditions of the immediately preceding agreement.

57.     Stark and the implementing regulations provide an exception for personal services arrangements. Stark provides that remuneration "from an entity" will not give rise to a financial relationship under the law *if seven conditions are met*: (1) The arrangement must be set out in a writing signed by the parties and the writing must specify the services covered; (2) The

14

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

arrangement covers all of the services to be provided by the physician to the entity; (3) The aggregate services contracted for may not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement; (4) The term of the arrangement must be for at least one year; (5) The compensation to be paid over the term of the arrangement must be set in advance, must not exceed fair market value and, except in the case of a physician incentive plan, may not be determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties; (6) The services to be furnished under the arrangement may not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law; and (7) The arrangement must meet such other requirements as CMS may impose by regulation. 42 U.S.C. § 1395nn(e)(3).

58.     Recognizing that physician recruitment is a common and beneficial practice in the healthcare industry, Congress created an exception under Stark for physician recruitment arrangements and an exception for physician recruitment arrangements similarly was created in the implementing regulations. Under the regulations, "[r]emuneration provided by a hospital to recruit a physician that is paid directly to the physician and is intended to induce the physician to relocate his or her medical practice to the geographic area served by the hospital in order to become a member of the hospital's medical staff" will not create a compensation arrangement if several conditions are met. 42 C.F.R § 411.357(e)(1).

59.     The CMS has appended an anti-kickback statute compliance requirement to several of Stark's exceptions, including the fair market value compensation exception, the physician recruitment exception and the indirect compensation arrangements exception, requiring that, for the exception to apply, the arrangement must not violate the Anti-Kickback Statute.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

### III.    The Federal Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b)

60.    The Federal Anti-Kickback Act ("AKA") makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person (a) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (b) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. §1320a-7(b)(1) and (2).

61.    The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. § 1320a-7b(b)(1). Any ownership interest or compensation arrangement that constitutes a financial relationship under Stark would also constitute remuneration as defined by the AKA, unless a kickback safe harbor applies.

62.    Knowing and willful conduct is a necessary element of this criminal offense. 42 U.S.C. § 1320a-7b(b)(1). An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-8 (11th Cir. 1998). The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats,* 871 F.2d 105 (9th Cir. 1989); *United States v. Greber,* 760 F.2d 68 (3d Cir.)., *cert denied.* 474 U.S. 988 (1985).

63.    Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment of up to five years, or both. Any party convicted under the AKA must be excluded (i.e., not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the AKA, the Secretary may

exclude that provider from the Federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320A-7(b).

**Bartow HMA, Inc.**

64.    On June 9 and 10, 2008, Relator performed a hospital compliance audit at Bartow Regional and discovered that Bartow Regional had entered into a 5 year lease with Dr. Deborah Ford commencing on January 1, 2003. The rental rate per contract commenced at $13.50 per square foot for 2003 and escalated for each year thereafter so that, in year 5, the rental rate was $14.91 per square foot. The file, however, contained information on fair market value obtained in 2004, indicating that the fair market value of the leased space was $15.00 per square foot. Thus, the lease was not consistent with fair market value and, therefore, did not meet the conditions of a rental lease exception under Stark. During the period of the lease, Bartow Regional had a financial relationship with this physician. During the period of this lease, every referral made by this physician to Bartow Regional is subject to prohibition.

65.    On June 9 and 10, 2008, Relator performed a hospital compliance audit at Bartow Regional and discovered that Bartow Regional entered into a contract with Dr. Stanley Zemankiewiez for Orthopedic call coverage, commencing on November 18, 2005, which provided that the physician would be paid at the rate of $500.00 per 24 hour period after 10 days of non-compensated call coverage. The contract did not contain a term of at least one year but, rather, was for an initial term of one month and provided that it would renew on a month to month basis. Accordingly, this contract did not meet the Stark exception for personal services arrangements and, thus, Bartow Regional had a financial relationship with this physician. During the course of this contract, every referral made by this physician to Bartow Regional is subject to prohibition.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

66.     On June 9 and 10, 2008, Relator performed a hospital compliance audit at Bartow Regional and discovered that Bartow Regional entered into a contract with Dr. Sarah Evans for call coverage commencing on June 16, 2005, which provided that the physician would be paid at the rate of $500.00 per 24 hour period after 10 days of non-compensated call coverage. The contract did not contain a term of at least one year but, rather, was for an initial term of one month and provided that it would renew on a month to month basis. Accordingly, this contract did not meet the Stark exception for personal services arrangements and, thus, Bartow Regional had a financial relationship with this physician. During the course of this contract, every referral made by this physician to Bartow Regional is subject to prohibition.

67.     On June 9 and 10, 2008, Relator performed a hospital compliance audit at Bartow Regional and discovered that Bartow Regional entered into a contract with Radiology and Imaging Specialists of Lakeland, P.A. for the period of October 1, 2006 through September 30, 2011. The contract provided that Bartow Regional would reimburse this group for a radiology assistant and, after March 2007, would pay the group $250.00 per hour for medical director services in excess of 15 hours per month. An audit sample of three payments made to this group during the period of January through May, 2008 revealed that Bartow Regional was paying the group $50.00 to $100.00 per read although these services were not covered by the contract. In addition, two payments had been made during the time period of January through February, 2008 for services related to worker's compensation claims, although such services were not part of the contract. This contract did not meet the Stark exception for personal services arrangements and, thus, Bartow Regional had a financial relationship with this physician. During the course of this contract, every referral made by this group to Bartow Regional is subject to prohibition.

68.     In July 2011, Relator conducted a compliance investigation at Bartow Regional and discovered that the hospital had entered into Gynecological call coverage contracts with Dr.

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

Ralph Nobo and Dr. James Booker for the period of May 1, 2010 through April 30, 2011 at a rate of $550.00 per day. However, Bartow Regional does not provide any such women's services. Accordingly, the contracts did not meet the Stark exception for personal services arrangements and, thus, Bartow Regional had a financial relationship with these physicians. During the course of these contracts, every referral made by these physicians to Bartow Regional is subject to prohibition.

69.     In July 2011, Relator conducted a compliance investigation at Bartow Regional and discovered that, in an effort to bail out Dr. Ruiz and three other physicians who owned a failing urgent care center (Cynergy Urgent Care Center), located at 4692 Exploration Avenue, Lakeland, Florida, Bartow Regional entered into a 7 year lease for the hospital to lease the center space. Bartow Regional also purchased the assets of the center, including a digital x-ray machine. The leased space never has been used by the hospital and the digital x-ray machine was left in the empty space and, similarly, never has been used by the hospital.

**Brandon HMA, Inc.**

70.     On June 7 and 8, 2006, a compliance audit of Rankin Medical Center was conducted by Relator and it was discovered that the hospital had entered into a contract with a cardiologist, Dr. George Schimmel, that allowed for payments to the physician in excess of the hospital's reimbursement. The file contained no documentation as to how the physician compensation was calculated or supporting the fair market value of the payments. The audit showed that the hospital lost money on 10 of the 13 interpretation services provided for in the contract. Thus, the hospital had a financial relationship with this physician that did not meet the exception under Stark for personal services arrangements. During the course of this contract, every referral made by this physician to Rankin Medical Center is subject to prohibition.

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

71.     On June 7 and 8, 2006, a compliance audit of Rankin Medical Center was conducted by Relator and it was discovered that the hospital had entered into a contract with the Medical Director of the Vascular Lab, Dr. Ed Rigdon, which provided for payment to Dr. Rigdon of $151.76 per hour. However, the rate of payment was increased in March 2006 to $175.00 per hour without any documentation to support that change. The physician was receiving payment at a rate higher than that provided for in the contract and, thus, from March 2006, the hospital and physician had a financial relationship that did not meet the exception under Stark for personal services arrangements. Accordingly, from that point in time, every referral made by this physician to Rankin Medical Center is subject to prohibition.

72.     On June 7 and 8, 2006, a compliance audit of Rankin Medical Center was conducted by Relator and it was discovered that the hospital had entered into a lease with Dr. Stephen Ringel for a term of less than 12 months in violation of the requirement under Stark that, to be subject to exception, such a contract must be for a minimum term of 12 months. Moreover, during the term of this lease, the physician was making payments below the rate specified in the contract. Accordingly, during this period of time, there existed a financial relationship between this physician and the hospital and every referral made by this physician to the hospital is subject to prohibition.

73.     On June 7 and 8, 2006, a compliance audit of Rankin Medical Center was conducted by Relator and it was discovered that the hospital had entered into a one year agreement to lease 2,041 square feet of space from Dr. Schimmel next door to the hospital at the rate of $2,220 per month. The hospital then subleased 1,020 square feet of that space to Dr. Lucius Sams for a two year term, January 15, 2005 through January 14, 2007, at the rate of $1,099.00 per month. However, the hospital has allowed Dr. Sams to occupy and utilize the entire 2,041 square feet of space even though he is only paying for one half of that space per the

20

contract. In addition, Dr. Sams has been paying only $1,050.00 per month rent even though the contract specifies a monthly rent of $1,099.00. During this lease term, there existed a financial relationship between Dr. Sams and the hospital and, thus, every referral made by this physician to Rankin Medical Center is subject to prohibition.

74.     On June 7 and 8, 2006, a compliance audit of Rankin Medical Center was conducted by Relator and it was discovered that, between October 2004 and May 8, 2006, the hospital employed psychiatry technician Antonis Purvis. However, it was learned that the employee had been placed on the OIG exclusion list pursuant to exclusion type # 1128(a)(2) ("Patient abuse/neglect conviction") on January 19, 2005. Thus, between January 19, 2005 and May 6, 2006, all billings to Medicare for costs associated with services provided by this employee were prohibited.

75.     On February 24 through February 27, 2009, a compliance audit of Crossgates River Oaks Hospital was conducted by Relator and it was discovered that the hospital had entered into a two year contract, the term of which was April 1, 2008 through March 31, 2010, with Dr. Berry Whites to perform specified services. It also was discovered that Dr. Whites was being compensated for providing PFT services to the hospital and that such services were not included in the contract. Thus, there existed a financial relationship between this physician and the hospital and every referral made by this physician to Crossgates River Oaks Hospital is subject to prohibition.

76.     On February 24 through February 27, 2009, a compliance audit of Crossgates River Oaks Hospital was conducted by Relator and it was discovered that the hospital had entered into a two year contract, the term of which was August 1, 2008 through July 31, 2010, with Jackson Radiology to perform specified services. However, it also was discovered that Jackson Radiology was compensated in November 2008 for services in connection with worker's

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

compensation claims that were not included in the contract. Thus, there existed a financial relationship between Jackson Radiology and the hospital and every referral made by this physician group to Crossgates River Oaks Hospital is subject to prohibition.

77.     On February 24 through February 27, 2009, a compliance audit of Crossgates River Oaks Hospital was conducted by Relator and it was discovered that the hospital had entered into a space lease with Mississippi Family Doctors, which lease had expired on April 30, 2008. A renewal lease had been executed but was not effective until January 1, 2009. Thus, the group leased space from the hospital for a period of 8 months without a written lease, in violation of Stark. Accordingly, any referrals made by this physician group during the period a signed lease was not in effect, are subject to prohibition.

78.     On February 24 through February 27, 2009, a compliance audit of Crossgates River Oaks Hospital was conducted by Relator. The fair market value information in the file, dated March 2007, noted that Class A full service space lease rates were $15.00 per square foot and up and Class B full service lease rates were $12.50 per square foot and up. Fair market value information obtained by the hospital dated November 20, 2008 indicated that Class A full service space lease rates were $14.00 and up and Class B full service lease rates were $12.50 per square foot and up. It was discovered that the hospital had a lease with Dr. Richard Pharr in October 2008 with a lease rate of $11.49 per square foot. The hospital had a lease with Dr. Douglas Gorman in October 2007 with a lease rate of $11.16 per square foot. The hospital had a lease with Dr. Richard Randolph in October 2007 with a lease rate of $11.16 per square foot. The hospital had a lease with Dr. Xlaohong Si in March 2009 with a lease rate of $11.16 per square foot. The hospital had a lease with Dr. George Wilkerson with a lease rate of $11.16 per square foot. The hospital had a lease with Dr. Ed Rigdon with a lease rate of $11.16 per square foot. The hospital had a lease with Mississippi Family Doctors in January 2009 with a lease rate of $11.00

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

per square foot. Because all of these leases were not for fair market value, the hospital had a financial relationship with all such physicians not subject to an exception under Stark and, thus, any referrals made by such physicians during the periods of their respective under market leases are subject to prohibition.

79.    On February 24 through February 27, 2009, a compliance audit of Crossgates River Oaks Hospital was conducted by Relator. It was discovered that the hospital had a services contract with Dr. Akinyinka Ajelabi with a start date of November 1, 2007. The hospital CEO, however, did not sign the contract on behalf of the hospital until July 29, 2008. Thus, for the period of November 1, 2007 through July 29, 2008, the hospital had a financial relationship with this physician and the contract between the hospital and this physician was not subject to the exception under Stark. Accordingly, any referrals made by such physician during the period a signed lease was not in effect are subject to prohibition.

**Clarksdale HMA, LLC**

80.    A routine quarterly report for the first quarter of 2007 by the hospital CFO indicated that, since July 2006, Dr. Weiner had been in possession of renewal space leases but had not returned them signed. On May 22 and 23, 2007, a compliance audit of the hospital was conducted by the Relator. That audit confirmed that Dr. Weiner's lease had expired in July 2006 and that the renewal contract was only signed in May 2007. In addition, the audit disclosed that Dr. Weiner had been occupying a second office since August 2006 without a current lease agreement. That new lease agreement was not executed until May 2007. Thus, there existed a period during which the hospital and the physician had a financial relationship not subject to an exception under Stark and any referrals made by such physician during the period of disallowance are subject to prohibition.

23

81.    On May 22 and 23, 2007, a compliance audit of the hospital was conducted by the Relator. That audit revealed that a number of physicians were indebted to the hospital for back rent for space. At the time, Dr. Lipson owed $15,000.00; Dr. Weiner owed over $21,000.00 and also owed $11,275.00 for a Nurse Practitioner; Dr. Brooks owed $4,000.00; Dr. Bosch owed $35,000.00; Dr. Berryhill owed $12,000.00 for a Nurse Practitioner. In addition, Dr. Bosch owed $35,000.00 on an equipment loan made to the physician by the hospital. Because the hospital failed to collect amounts due, it had a financial relationship with the physicians not subject to any exception under Stark, rendering any referrals made by such physicians subject to prohibition.

82.    On May 22 and 23, 2007, a compliance audit of the hospital was conducted by the Relator. That audit revealed that Dr. Smith was being compensated for ICG services without having a contract for the provision of such services. Accordingly, the hospital had a financial relationship with this physician not subject to any exception under Stark, rendering any referrals made by such physician subject to prohibition.

**Durant HMA, LLC**

83.    Relator visited the hospital on several occasions in 2010 and conducted a hospital on-site visit on August 9 and 10, 2010. It was determined that numerous Medicare 1-Day Stay patients had been billed as in-patient when they did not meet criteria. In fact, under extreme pressure exerted by hospital CEO, the hospital engaged in a pattern and practice of fraudulent Medicare billing by admitting patients who did not meet admission criteria. Dr. Vernon Murphy, a physician on staff at the Sebring hospital who is utilized by HMA to conduct reviews of medical records company wide, reviewed patient charts and stated in an email dated August 8, 2010: "The more charts I review, the more I understand that the problem is not just a process problem. It is a metastatic malignancy that has encroach[ed] upon their entire system."

24

**Gaffney HMA, LLC**

84.    As set forth in the Hospital Compliance Audit worksheet of June 2006 and the Executive Summary Memo of August 2006, at the time of reporting, the hospital had eight written agreements with physicians which had expired. Accordingly, for any period during which no written  agreement lease was in effect, the hospital and affected physicians had a financial relationship, subjecting to prohibition any referrals made.

85.    As set forth in the hospital Compliance Audit worksheet of June 2006 and the Executive Summary Memo of August 2006, a physician group, Upstate Carolina Emergency Physicians, was compensated for services which were not subject to a written agreement. Thus, the hospital had a financial relationship with this physician group to which the Stark exception for personal services arrangements was inapplicable, rendering every referral made by this group to the hospital subject to prohibition.

86.    The hospital leased 1,984 square feet of space from Dr. Alfred Randall Moss for a contract term of May 1, 2005 through April 30, 2006 at the rate of $9.27 per square foot (monthly rental of $1,532.64. Following the expiration of the lease on April 30, 2006, the lease continued on a month to month basis in accordance with a verbal agreement. The October 15, 2007 hospital compliance officer quarterly report noted the expiration of that lease in April 2006. Thus, the hospital had a financial relationship with this physician that did not meet an exception under Stark. Any referrals made by this physician are subject to disallowance.

**Haines City HMA, LLC**

87.    The hospital leased space from Emergency Physician Specialist, Inc. at 2231 N. Blvd. in Davenport, Florida. The space consisted of 2,192 square feet. The lease contract between the parties expired on November 14, 2006 and, as of an audit conducted on August 8, 2007, a new contract had not been executed. Nevertheless, during the audit it was determined

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

that, even though the hospital did not have a valid lease contract, it subleased the space to Dr. Samuel Messieh, d/b/a Messieh Orthopedic Clinic, for a lease term of February 1, 2007 through January 31, 2009. In a fourth quarter 2008 hospital compliance officer report dated January 2009, the sublease was noted, as was a lease with Cambo Medical Services. The Cambo lease had a term of November 15, 2007 through November 14, 2008, the hospital was noted as the tenant and the leased space was the same space that the hospital had leased from Emergency Physician Specialist, Inc. - - *i.e.*, 231 N. Blvd. in Davenport, Florida. Thus, even assuming that the ownership of the property changed from Emergency Physician Specialist, Inc. to Cambo Medical Services and that the lease from Cambo to the hospital was valid, there nevertheless was a period of disallowance between November 15, 2006 until at least November 15, 2007, during which time there was a financial relationship between the parties not subject to an exception under Stark. Accordingly, any referrals made during this period are subject to disqualification.

88.     On August 8 and 9, 2007, a compliance audit of the hospital was conducted by the Relator. It was determined that two different physician groups - - Radiology Consultants and Emergency Physician Specialist, Inc. - - were paid by the hospital for services that were not subject to a written contract, in violation of the Stark law. Accordingly, there existed a financial relationship between these groups and the hospital not subject to an exception under Stark.

**Key West HMA, LLC**

89.     The hospital's compliance officer's compliance report for the fourth quarter of 2005, dated April 19, 2006, revealed that a physician, Dr. Piriellas, was using space in the hospital's primary care clinic without a written agreement and rent free. Thus, there existed a financial relationship between this physician and the hospital not subject to an exception under Stark. Any referrals by this physician would be subject to prohibition.

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

90.     The hospital's compliance officer's compliance report for the fourth quarter of 2005, dated April 19, 2006, revealed that a pathologist was using space in the hospital without a written agreement and rent free. Thus, there existed a financial relationship between this physician and the hospital not subject to an exception under Stark. Any referrals by this physician would be subject to prohibition.

91.     The hospital entered into a written lease agreement with Dr. Donald Harrell from January 16, 2006 through January 15, 2007. Following the expiration of that lease, the parties were unable to come to agreement regarding terms in order to enter into a new lease. The physician continued to occupy the space after the expiration of the lease and up until August 2007 under the same terms and conditions of the original lease pursuant to a verbal agreement with the hospital. Thus, there existed a financial relationship between the hospital and this physician not subject to an exception under Stark. Accordingly, any referrals by this physician would be subject to prohibition.

92.     On March 12 and 13, 2008, a compliance audit of the hospital was conducted by Relator. The audit revealed that Dr. Joseph O'Lear, the Medical Director of Psychiatric Services, was being paid in excess of that provided for in the written agreement. Thus, there existed a financial relationship between the hospital and this physician, not subject to an exception under Stark. Accordingly, any referrals by this physician are subject to prohibition.

93.     On March 12 and 13, 2008, a compliance audit was conducted by the Relator. It was determined that emergency room physicians were providing services without an executed written agreement. Thus, there existed a financial relationship between the hospital and such physicians, not subject to an exception under Stark. Accordingly, any referrals by this physician are subject to prohibition.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

94.     In the hospital's quarterly physician agreement certification dated January 15, 2009, it was revealed that Dr. Genchi's lease agreement had expired on June 30, 2008 and he continued to occupy the leased space on the same terms and conditions as set forth in the original lease. Thus, there existed a financial relationship between the hospital and such physicians, not subject to an exception under Stark. Accordingly, any referrals by this physician are subject to prohibition.

95.     The hospital's January 15, 2009 quarterly compliance report for the fourth quarter of 2008 revealed that all Emergency Room call coverage contracts expired on September 30, 2008 and, thus, Emergency Room physicians were providing services without an executed written agreement. Thus, there existed a financial relationship between the hospital and such physicians, not subject to an exception under Stark. Accordingly, any referrals by this physician are subject to prohibition.

**Lone Star HMA, L.P.**

96.     As of January 2011, Dr. Nagara Kikkeri of Mesquite Anesthesiology Associates, P.A. occupied three different spaces at the hospital. One of these spaces was B-240, consisting of 1,790 square feet, which he occupied full time. There exists in the hospital contract file an unexecuted lease contract for that space for the period of October 1, 2005 through September 30, 2010. However, no executed original or copy of this lease could be located either at the hospital or at the physician's office. Thus, the hospital had a financial relationship with this physician for this period of time which is not subject to any exception under Stark. Thus, any referrals made by this physician are subject to prohibition.

97.     The Quarterly Physician Agreement Certification dated January 15, 2009 from the hospital's CEO and CFO advised: "There is an issue with Mesquite Professional Anesthesia. The contract had an addendum in early 2008 and was to be renegotiated. We have apparently

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

overlooked this and we do not have a valid contract as of July 31, 2008." Thus, from July 31, 2008, there existed a financial relationship between the hospital and this physician which is not subject to an exception under Stark. Any referrals made by this physician are subject to prohibition.

98.     The hospital entered into a physician lease agreement with Dr Aaron Kreisler for the period of June 1, 2004 through May 31, 2009. The lease was for 1,674 square feet and provided for rental payments that escalated each year. Based on fair market value information provided to the hospital, however, the rent paid by Dr. Kreisler was under fair market value and, thus, there existed a financial relationship between the hospital and this physician which was not subject to an exception under Stark. Thus, any referrals made by this physician are subject to prohibition.

99.     The hospital entered into a physician lease agreement with Dr. Donald Koepsell for the period of July 1, 2005 through June 30, 2010 for 1410 square feet. The lease provided for rental payments that escalated each year. Based on fair marked information provided to the hospital, the rent paid by Dr. Koepsell was under fair market value and, thus, there existed a financial relationship between the hospital and this physician which was not subject to an exception under Stark. Accordingly, any referrals made by this physician are subject to prohibition.

100.     Relator conducted a compliance on-site visit of the hospital on August 11 and 12, 2010 and identified serious compliance issues involving, in part, the intentional submission of inappropriate billing to Medicare for 1-Day Status. Laura Cooper, a Resource Manager at the hospital, and other hospital employees had been advised specifically by Ken Ward, the Chief Operating Officer, that, if a patient remains at the hospital in observation status for two days, they were to be switched to in-patient status whether or not they met inpatient criteria. This

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

employee advised that at least one patient per day is incorrectly converted from observation to inpatient status without receiving the increased level of care for an inpatient and another two to three patients are admitted even though they do not meet criteria.

**Marathon HMA, LLC**

101.     The hospital recruited and provided financial incentives to orthopedic physicians, Dr. Loeffler and Dr. Matarazzo, even though a community needs analysis showed a current excess of orthopedics with only a slight future need due to attrition. The hospital also paid Dr. Loeffler in advance of his provision of services to the hospital. The file contained no explanation as to the reason Dr. Loeffler was paid a full year's worth of compensation after being at the hospital for only three months. The hospital made an equipment loan to Dr. Matarazzo that was not repaid. The hospital had a financial relationship with these physicians not subject to an exception under Stark.

102.     A compliance audit of the hospital was conducted on August 3 and 4, 2005.  It was determined that the hospital had paid a malpractice insurance premium in the amount of $30,956.00 for Dr. Whitaker, an anesthesiologist, who had no written contract with the hospital. The hospital had a financial relationship with this physician not subject to an exception under Stark.

103.     The hospital entered into a lease agreement with Dr. Andrew Wolszezak at a rate below the fair market value. In fact, the hospital was paying approximately $1.50 per square foot more to master lease the space than the rate it was charging Dr. Wolszezak. The hospital had a financial relationship with this physician that was not subject to an exception under Stark.

104.     The hospital had a lease agreement with Dr. O'Connor. The physician vacated the space owing back rent in the approximate amount of $7,000.00, which the hospital failed to

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

collect. The hospital had a financial relationship with this physician that was not subject to an exception under Stark.

105.    The hospital made an equipment loan to a physician, Dr. Goodman. The physician failed to repay the loan and the hospital failed to collect. As of an audit conducted by Relator on November 28 and 29, 2006, the physician owed the hospital approximately $11,000.00 and the last payment that had been received was in March 2005. The hospital had a financial relationship with this physician that was not subject to an exception under Stark.

**Meridian HMA, LLC**

106.    The hospital's written contract with Diagnostic Tissue/Cytology Group expired on September 30, 2006. The hospital nevertheless made payments to the group after the expiration of the contract, including payments in October and November 2006 in the total amount of $8,000.00. The hospital had a financial relationship with this physician group that was not subject to an exception under Stark.

107.    The hospital's quarterly compliance report for the first quarter of 2007 notes significant compliance issues involving a substantial amount of outpatient lab and x-ray tests performed at the hospital that were performed without any order signed by the physician and, in some instances, without any order at all.

**Midwest Regional Medical Center**

108.    During a routine hospital audit in June 2009, it was discovered that a hospitalist group, Inpatient Consultants of Texas, PLLC ("IPC"), had a written agreement to provide hospitalist services from July 5, 2005 through July 4, 2012. However, verbal changes were made to the original written agreement and services were provided which were not included in the written agreement. In addition to the services noted in the executed agreement, IPC provided additional family practice call coverage through recruited full-time physicians, part-time

31

community physicians and locum tenens and was compensated by the hospital. Between October 2007 and April 2009, the hospital paid IPC over $400,000.00 for services provided outside of the written agreement. The hospital had a financial relationship with this physician group that was not subject to an exception under Stark.

109.    Dr. James Mays leased office space from the hospital from August 1, 2004 through July 31, 2006. However, the CEO of the hospital did not execute the contract until September 20, 2005. Thus, for over a year, from August 1, 2004 through September 19, 2005, this physician was leasing space from the hospital without a written agreement. During this period, the Medicare total gross revenue attributed to this physician's referrals was approximately $2.7 million, with the total collected in excess of $600,000. During this period, the hospital had a financial relationship with this physician which was not subject to any exception under Stark.

110.    The hospital leased space to Dr. Fayyaz Hashmi pursuant to a written agreement from December 6, 2004 through December 31, 2005. After extensions, the lease agreement expired on December 31, 2008. As of the audit conducted in June 2009, this physician remained in the space with no written agreement. The hospital had a financial relationship with this physician which was not subject to any exception under Stark.

111.    A hospital compliance audit conducted by Relator on July 12 and 13, 2006 identified fifteen physician contracts that were expired at the time of audit. Documents relating to this audit should be located in the audit file folders at HMA in its Naples, Florida office. For example, the hospital's contract with Medical Neurologists, Inc., a group comprised of five physicians, had expired in March, 2006; the hospital's service contract with Dr. Jerome Mathias had expired on December 31, 2005; the hospital's services contract with Dr. Christopher Jordan had expired on April 31, 2005; the hospital's services contract with Dr. Suresh Chandrasekaran

32

had expired on December 31, 2005; and the hospital's services contract with Midwest City Anesthesia Associates, PC had expired on July 31, 2004. As to this Midwest City Anesthesia Associates, PC contract, a letter of extension was prepared on November 17, 2005 and backdated to August 1, 2004. Dr. Jordan had a space lease which had expired on June 30, 2004 but, at the time of audit, he was still occupying the space. Dr. Wlodaver had a services contract for which he was paid above fair market value as the contract called for $82.40 per hour and he was paid $125.00 to $208.00 per hour. Dr. Shannon Pederson was occupying a space without having a written contract since July 2004. The hospital, thus, had a financial relationship with each of these physicians which was not subject to any exception under Stark.

**Naples HMA, LLC**

112.    Cardiologists, Dr. Maurice Schneider, Dr. Richard Gelb and Dr. Mouhannad Dalao, all provided to the hospital and were paid for services such as ECHO interpretations and stress tests that were not within the scope of any written agreement. Moreover, all had significant gaps during which they were providing services to the hospital without any written contract in place. Dr. Schneider was responsible for approximately $1.6 million in revenue to the hospitals during the gaps. The hospital had a financial relationship with these physicians which was not subject to any exception under Stark.

113.    Commencing in January 2010, the Relator monitored the activities of both the Pine Ridge and Collier campuses of Naples HMA, LLC and uncovered serious compliance issues involving the submission of fraudulent billing to Medicare through the improper admission of patients as inpatients even though such patients clearly did not meet the standards for inpatient admission. The Relator identified the patient charts at issue and determined that, during the first six months of 2010 alone, over $300,000.00 in payments had improperly been received by the hospital due to such fraudulent billing. In August 2010, Mr. Meyer followed up

on these compliance issues and determined that no meaningful action had been taken to rectify the fraudulent billing practices ongoing within these facilities.

**Natchez Community Hospital, LLC**

114.    The hospital's compliance officer's report dated July 15, 2008 indicated numerous contracts with Dr. Barry Tillman. The hospitalist contract was for a term of less than one year, from February 1, 2007 through October 29, 2007. The medical director contract was for a term of February 28, 2007 through October 29, 2007, a term of less than one year. The hospital had a financial relationship with this physician not subject to an exception under Stark.

115.    A hospital compliance audit in May 2006 identified a payment by check dated July 21, 2005 in the amount of $51,792.00 for a medical malpractice insurance premium for Dr. Jay Schwartz. This disbursement was not covered in the hospital's contract with Dr. Schwartz. The hospital had a financial relationship with this physician not subject to an exception under Stark.

116.    A hospital compliance audit in May 2006 identified a space lease with Dr. Eugene Taylor that had expired in July 2005. The hospital compliance officer report dated July 15, 2008 also indicated that the lease with Dr. Taylor had expired and that they were working with the physician for a new contract. The hospital had a financial relationship with this physician not subject to an exception under Stark.

117.    A hospital compliance audit in 2008 identified a physician recruitment agreement dated December 2007 with Dr. Bernard Boka pursuant to which Dr. Boka was paid recruitment benefits. However, Dr. Boka was not required to obtain staff privileges at the hospital, or to have a valid Mississippi license. Rather, Dr. Boka was to work at an urgent care center located in the adjoining state of Louisiana and would be working at a non-HMA hospital, Riverpark Medical

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

Center in Louisiana. Accordingly, this arrangement failed to meet the recruitment exception under Stark.

## NC Louisburg HMA Physician Management, LLC

118.    A compliance audit conducted in August 2006 identified that Dr. Schwam was paid approximately $75,000.00 during the year 2005 for anesthesiology services to hospital surgical patients without having any contract with the hospital. The surgical patients paid upfront at the time of service and the hospital collected this cash on behalf of Dr. Schwam and, in turn, paid Dr. Schwam for the services. Thus, there existed a financial relationship between the hospital and this physician not subject to an exception under Stark and any referrals by this physician are subject to prohibition.

119.    During a compliance audit conducted in August 2006, it was determined that Dr. Ghassan Al-Sabbagh had a call coverage contract with the hospital that had not properly been executed until two months after its start date. During the period when no contract between the parties was in effect, the physician provided services and was compensated for those services. Thus, there existed a financial relationship between this physician and the hospital. In addition, the hospital made a payment to the physician in July 2005 for computer equipment in the amount of $1,395.28 without a written contract.

120.    During a 2006 audit of the hospital, it was discovered that the hospital was paying Dr. Ghassan Al-Sabbagh for the services of a surgical nurse at an hourly rate of $31.24 that was in excess of the fair market value ($28.00) of such services.  The hospital also failed to track the hours worked by the nurse and paid for hours in excess of 40 hours per week. In addition, duplicate payments were made for the first four months of 2005. The surgical nurse was the wife of the hospital's CEO.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

121.    The hospital had a contract with Orthopaedic Specialists of North Carolina that expired on September 1, 2005. Not only did this group provide and receive payment for services not noted in the contract, the group continued to provide services following the expiration of the contract. In addition, the compliance audit in August 2006 disclosed that approximately $25,000.00 in payments due the group were held by the hospital and not paid until the end of the fiscal year, thereby influencing the financial operational results of the hospital. The hospital had a financial relationship with this physician group not subject to an exception under Stark and, thus, any referrals by these physicians are subject to prohibition.

122.    Wakefield Pediatrics and Adolescent Medicine, P.A. (Dr. Milton Sevilla) leased two spaces from the hospital and had leased an earlier space. There was some confusion as to whether the transition from one space to the other had been correctly completed pursuant to the contract. Dr. Sevilla paid rent below the rate specified in the contract for approximately three years, resulting in him owing the hospital, at the time of audit, approximately $25,000.00 in back rent.

### Poplar Bluff Regional Medical Center, LLC

123.    The Relator conducted a hospital compliance audit on August 29 and 30, 2007. The audit identified a Locum Tenens radiology contract with Dr. George Ladyman that had expired on May 31, 2007. The hospital made three payments after the expiration of the contract - - $12,000.00 on June 28, 2007, $10,000.00 on July 26, 2007 and $1,250 on August 6, 2007. The file contained no fair market value analysis and no supporting documentation for the payments made other than a letter from the physician indicating the number of days worked. The hospital had a financial relationship with this physician that did not satisfy an exception under Stark.

124.    The Relator conducted a hospital compliance audit on August 29 and 30, 2007. The audit identified a Medical Director-Chief Medical Officer contract with Dr. Austin Tinsley

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

that had expired on May 31, 2007. The hospital made two payments after the expiration of the contract - - $3,000.00 on July 5, 2007 and $17,910.00 on August 6, 2007. The hospital had a financial relationship with this physician that did not satisfy an exception under Stark.

125.   A hospital compliance officer report dated April 16, 2007 indicated that three OB/GYN physicians, Dr. Carl Patty, Dr. John Patty and Dr. Carrie Carda, rotate through the rural health clinics one day per month to see their patients. Without having any written agreement, the hospital provided and had provided to the physicians for several years, space, supplies and labor without charging the physicians anything. Thus, the hospital had a financial relationship with such physicians not subject to any exception under Stark.

**Port Charlotte HMA, LLC**

126.   A hospital compliance audit conducted by Relator on February 13 and 14, 2008 identified a contract with Dr. Anthony Brignoni  for various call and in-hospital services, which contract had expired on May 31, 2006. However, at the time of the audit, Dr. Brignoni was still was providing services and receiving payments, even though the contract had expired. The audit determined that a payment to the physician in the amount of $16,379.00 had been made on December 8, 2005, prior to the expiration of the contract, but that payment did not appear on the physician's accounts payable history and, had it been recorded, would have made the total compensation paid to this physician in excess of that permitted by the contract. In addition, the following payments were determined to have been made after expiration of the contract: $11,465.00 paid on August 30, 2006 (although the hospital was unable to locate either a copy of the check or the check request for this payment); $15,485.00 paid on November 27, 2006; $10,485.00 paid on May 21, 2006; $9,961.00 paid on November 5, 2007; and $5,000.00 paid on February 11, 2008. The hospital had a financial relationship with such physician not subject to any exception under Stark.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

127.    A hospital compliance audit conducted in March 2009 identified a reimbursement payment made via check dated June 9, 2008 to Dr. Anthony Brignoni for expenses incurred by the physician entertaining other physicians during two dinners. This reimbursement was not covered by written agreement. Thus, the hospital had a financial relationship with such physician not subject to any exception under Stark.

128.    A hospital compliance audit conducted in March 2009 identified an emergency room call contract with Dr. Jason Reiss which had expired on November 1, 2007. A renewal contract was executed with an effective date of December 1, 2008. During the thirteen month period of November 1, 2007 through December 1, 2008, the physician provided services and was paid by the hospital approximately $2,800.00 per month, even though there was no written contract. Thus, the hospital had a financial relationship with such physician not subject to any exception under Stark.

129.    A hospital compliance audit conducted in March 2009 identified a medical director-respiratory therapy contract with Dr. George Panjikaran which had expired on May 31, 2008. It was determined that, by a check dated August 21, 2008, the physician was paid for services that had been rendered in June and July, 2008, after expiration of the contract. Thus, the hospital had a financial relationship with such physician not subject to any exception under Stark.

130.    A hospital compliance audit conducted in March 2009 determined that a contract with Dr. Tanweer Memon for medical director-case management services specified that Dr. Memon's compensation would be $200.00 per hour for a maximum of 28 hours per month. Nevertheless, between April 2008 and December 2008, the physician was paid for 50 hours ($10,000.00) beyond what the contract allowed. Thus, the hospital had a financial relationship with such physicians not subject to any exception under Stark.

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

131.    Dr. Ahsan Kamal was a physician employed by the hospital. This physician's practice was failing and was losing money for the hospital. The hospital CEO proposed a plan, which was approved by HMA, to move Dr. Kamal into the Primary Care Associates private practice, which would provide patients to Dr. Kamal which he could bill for the benefit of the hospital, since Dr. Kamal was employed by the hospital. The hospital entered into a contract with Primary Care Associates, whose president was Dr. Tanweer Memon, to manage Dr. Kamal's practice for a fee of $20,410.00 per month, paid by the hospital. The hospital had a financial relationship with Dr. Kamal as well as with the physician group Primary Care Associates which was not subject to any exception under Stark.

**Punta Gorda HMA, LLC**

132.    The hospital has two leases for property located at 10175 Tamiami Trail in North Port, Florida, each for a ten year term from June 1, 2008 through May 31, 2018. The landlord is Zia Butt, spouse of Dr. Farzana Butt, a pediatrician who provides services at the hospital. The property, however, is vacant and has not been subleased by the hospital. Zia Butt also is landlord for property leased by the hospital at 14575 Tamiami Train, North Port, Florida, a location which is well north of the hospital. The term of the contract is ten years, from December 1, 2008 through November 30, 2018. The hospital pays rent in excess of $10,000.00 per month. Upon information and belief, this location also is vacant. The hospital has a financial relationship with this physician that is not subject to an exception under Stark.

133.    The hospital leased 20,000 square feet of space from Corazon Development, LLC for the term of July 1, 2005 through June 30, 2010 at a rental cost of $41,314.30 per month. During the audit of the hospital, most, if not all of this space, was vacant. The principles of Corazon Development, LLC are cardiologists Terence P. Connelly and Mario Lopez, physicians

who provide services to the hospital. The hospital has a financial relationship with these physicians that is not subject to an exception under Stark.

### Rose City HMA, LLC

134.    Dr. Arif Hafiz of Internal Medicine Consultants of Lancaster started occupying space inside the hospital on June 1, 2007 as his practice's billing office. He had two employees working within the space and utilized the space on a full time, exclusive basis. However, he had no written lease agreement. The hospital entered into a lease agreement with the physician effective September 1, 2008 but that agreement was not signed by the hospital CEO until January 20, 2009. Accordingly, Dr. Hafiz occupied the space from June 1, 2007 until January 20, 2009 without any executed written lease agreement and, thus, during this period, the hospital had a financial relationship with this physician not subject to any exception under Stark. Accordingly, all referrals by this physician are subject to prohibition.

135.    The hospital had a lease with Central Penn Medical Group for the term of September 1, 2004 through August 31, 2007. Dr. Mihaela Andrian was employed by that group through May 31, 2006 and, during her employment, she occupied the leased space. Effective June 1, 2006, Dr. Andrian ceased her employment with Central Penn Medical Group and went into private practice. The hospital let Central Penn Medical Group out of the lease and prepared a new lease between the hospital and Dr. Andrian for the term of June 1, 2006 through May 31, 2008 at the rate of $2,582.26 per month. However, neither the hospital nor Dr. Andrian ever executed that lease agreement. Dr. Andrian continued to occupy the space and made only the following lease payments: January 2008 - $2,582.26; February 2008 - $2,582.26; and May 2009 - $5,000.00. A new lease agreement was prepared for the period of February 1, 2009 through January 31, 2010 but that agreement was not executed by the hospital until May 27, 2009. Thus, there existed a lengthy period of time between June 1, 2006 and May 26, 2009 during which this

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

physician occupied hospital space with no written agreement in place. During this period, the hospital had a financial relationship with this physician that is not subject to any exception under Stark. Referrals by this physician are subject to prohibition.

### HMA Santa Rosa Medical Center

136.    A compliance audit conducted in May 2009 identified a professional services contract with Dr. Douglas Tappan of Cordova Orthopedics Associates which had a term of less than one year - - June 1, 2006 through September 30, 2006. Review of the payments made to Dr. Tappan determined that, for each month of the year 2008, Dr. Tappan received payments of either $10,000.00 or $11,000.00 per month. In January and February 2009, Dr. Tappan received payments of $11,000.00 each month. All of these payments were for services rendered between December 2007 through January 2009, when no written agreement between the parties was in effect. The hospital had a financial relationship with this physician which was not subject to any exception under Stark.

137.    A compliance audit conducted in May 2009 identified a professional services contract with West Florida Radiology Associates, P.A. It was determined that this physician group was being paid for services provided which were not covered by the written contract, such as services provided at an urgent care center and in connection with new employee x-rays. Thus, the hospital had a financial relationship with this physician which was not subject to any exception under Stark.

138.    A hospital compliance audit conducted in May 2009 identified payment made via check dated January 15, 2009 to a physician group Pinnacle Physicians, LLC for four gastric sleeves. These services were not included in the contract between the hospital and these physicians. Thus, the hospital had a financial relationship with this physician group which was not subject to any exception under Stark.

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

139.    A hospital compliance audit conducted in May 2009 identified payment made via check dated February 19, 2009 to a physician group Anesthesia Health Care Partners of Florida, Inc., for three gastric sleeves. These services were not included in the contract between the hospital and these physicians. Thus, the hospital had a financial relationship with this physician group which was not subject to any exception under Stark.

**Sebastian Hospital, LLC**

140.    A hospital compliance audit conducted in January 2009 identified a space lease with Drs. Roberto Rose and Pedro Espat which had expired on August 31, 2007. A renewal contract was not signed until the time of the audit in January 2009. Both these physicians remained in the space during the approximate seventeen month gap between contracts. The hospital has a financial relationship with these physicians that is not subject to an exception under Stark.

141.    A hospital compliance audit conducted in January 2009 identified an on call – General Surgery contract with Dr. Edward Murphy which had a start date of July 1, 2008 and services were provided pursuant to the contract. However, the contract was not executed by the hospital CEO until September 23, 2008. Accordingly, there existed an almost three month gap during which services were rendered by the physician without an executed contract, creating a financial relationship between the hospital and the physician not subject to an exception under Stark.

142.    A hospital compliance audit conducted in January 2009 identified an on call – General Surgery contract with Dr. Derek Paul which had a start date of July 1, 2008 and services were provided pursuant to the contract. However, the contract was not executed by the hospital CEO until September 23, 2008. Accordingly, there existed an almost three month gap during

42

which services were rendered by the physician without an executed contract, creating a financial relationship between the hospital and the physician not subject to an exception under Stark.

143.     A hospital compliance audit conducted in January 2009 identified a payment made by the hospital to Dr. Michael Venazio for reimbursement of expenses for attending either a chief of staff conference or a medical director conference. There was no written agreement allowing the physician to be reimbursed for these expenses. The hospital had a financial relationship with this physician that is not subject to an exception under Stark.

### Sebring Hospital Management Association, LLC

144.     A hospital compliance audit conducted by Relator on September 19 and 20, 2007 revealed that, in June and July 2007, the hospital paid for advertising for seven physicians who comprise Highlands Regional Medical Plaza in Lake Placid, Florida. The physicians did not contribute to the cost of the advertising. The hospital has a financial relationship with these physicians that is not subject to an exception under Stark.

145.     A hospital compliance audit conducted by Relator on September 19 and 20, 2007 identified a lease between the hospital and Dr. Kevin Lee that had expired on September 30, 2004. A new lease was not executed until July 1, 2007. The original lease contained terms for a month-to-month holdover that required written confirmation by the hospital CEO and increased rental payments in the amount of 150% of the original rent. However, during the gap between October 1, 2004 and June 30, 2007, the physician continued to occupy the space and there was no written confirmation and no increase in rental payments. Therefore, the hospital had a financial relationship with this physician that is not subject to an exception under Stark.

146.     A hospital compliance audit conducted by Relator on September 19 and 20, 2007 identified a lease between the hospital and Dr. Roger Arumugan that had expired on September 30, 2005. A new lease was not executed until July 1, 2007. The original lease contained terms for

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

a month-to-month holdover that required written confirmation by the hospital CEO and increased rental payments in the amount of 150% of the original rent.  However, during the gap between October 1, 2005 and June 30, 2007, the physician continued to occupy the space and there was no written confirmation and no increase in rental payments. Therefore, the hospital had a financial relationship with this physician that is not subject to an exception under Stark.

### Van Buren HMA Central Business Office, LLC

147.   A hospital compliance audit conducted on April 25 and 26, 2008 identified two payments made to Dr. Joni Carmack - - one on October 6, 2005 in the amount of $945.00 and another on November 23, 2005 in the amount of $1,376.95 - - for training reimbursement which were not covered by any written agreement. Therefore, the hospital had a financial relationship with this physician that is not subject to an exception under Stark.

148.   The hospital had a written agreement with NES Arkansas. An addendum to that agreement on May 18, 2005 significantly increased the compensation to be paid by the hospital under the contract. A series of invoices were submitted for the maximum amount permitted under the contract without any supporting documentation. Thus, it appears that the hospital had a financial relationship with this provider group not subject to an exception under Stark.

149.   A hospital compliance audit conducted in September 2008 identified an issue involving the hospital's leasing of space located at 2020 Chestnut, Suite 108. Dr. Dean Flanigan had a part time lease for this space with a start date of February 1, 2007. Dr. Leonette Bebensee had a full time lease for this same space with a start date of July 1, 2007. Neither of these leases obtained hospital approval until November 29, 2007. Thus, it appears that the Stark requirement that the written agreement specify the premises covered by the lease was not met. It also appears that the Stark requirement that the space leased be used exclusively by the lessee was not met. Moreover, it appears that there was a gap period during which these physicians provided services

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

when no fully executed lease agreement was in effect and, accordingly, that the hospital had a financial relationship with these physicians not subject to an exception under Stark.

150.   A hospital compliance audit conducted in September 2008 identified a services contract with Arkansas Heart Center (Dr. Fine, Dr. Kantola, Dr. Espina and Dr. Alemparte) to provide cardiology ER call. The contract had a start date of January 1, 2008 but was not executed by the hospital CEO until May 2008. In addition, the hospital had a contract with this provider group for cardiology clinic services with a start date of January 1. This contract did not obtain hospital approval until July 2008. Thus, there existed a gap period when both ER call and cardiology clinic services were provided by these physicians with no written agreement in effect. Accordingly, the hospital had a financial relationship with these physicians not subject to an exception under Stark.

**Winder HMA, LLC**

151.   A hospital compliance audit conducted on February 22 and 23, 2007 identified a space lease with Georgia Dermatologic Surgery Center (Dr. Mark Baucom) which had expired on August 31, 2002. The lease did not have a holdover month-to-month clause. The physician continued to occupy the space at least through the date of the audit in February 2007. The physician continued to pay the original rental rate of $1,850.00 a month for 1394 square feet. A fair market value analysis showed the true square footage of the rented space to be 1457 and the appropriate rent to be $18.00 per square feet for a monthly rent of $2,185.50. The physician continued to pay $1,850.00 per month and, at the time of audit, was two months behind in his rent. Thus, for several years, from the expiration of the lease in 2002, the hospital had a financial relationship with this physician that was not subject to an exception under Stark.

152.   A hospital compliance audit conducted on February 22 and 23, 2007 identified a contract with an Emergency Room group Paragon Contracting Services/Team Health. The file

contained no documentation regarding the services for which the subsidy was being paid and, thus, fair market value could not be determined. However, the file did contain documentation regarding an Expectations Meeting with Team Health indicating that an admission rate goal had been set and was tied to bonus rate criteria and Pro-Med Benchmarks. Thus, it appears that admission goals were tied to compensation, in violation of Stark.

## CONDITIONS PRECEDENT

153.    As required under the Federal Civil False Claims Act, 31 U.S.C. § 3730(a)(2), Relator provided to the United States Attorney for the Southern District of Florida, simultaneous with the filing of this Complaint, a statement of all material evidence and information related to the Complaint.

## DEFENDANTS' WILLFUL AND INTENTIONAL CONDUCT

154.    Defendants have been consciously aware of the statutes governing their conduct at all material times hereto and, in fact, numerous instances of illegal conduct have been brought to their attention through hospital audits conducted by Relator.

155.    Inquiry by Relator into the widespread and blatant fraudulent conduct uncovered at Durant HMA, LLC relating to one day stay vs. observation issues led Relator to believe that such conduct was company wide based on comments made to him in 2010 by then Durant CFO. This CFO indicated to Relator that she and her CEO at a different HMA hospital had participated in a company wide conference call in which a senior company official advised all hospital participants that any observation patients were to be admitted. In 2011, there was a Helpline call from the then CEO of the Van Buren hospital alleging pressure from senior management to admit patients. Likewise, there was a 2011 Helpline call from an Emergency Department physician at the Carlisle, Pennsylvania hospital alleging pressure to admit patients through the Emergency Department without justification.

46

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

156.   Upon information and belief, Defendants failed to correct or disclose their illegal conduct to the United States as required.

157.   The unlawful financial relationships and prohibited remuneration as described herein are not isolated occurrences at HMA. Rather, HMA has conceived, designed and implemented a nationwide business strategy and corporate policy and practice that involves the submission of false Hospital Cost Reports. HMA, thus, has caused knowing violations of the False Claims Act by the HMA Hospitals named in this Complaint and is liable for the conduct of the HMA Hospitals as alleged herein.

### DAMAGES TO THE UNTED STATES

158.   The HMA Hospitals have established prohibited, non-exempt financial relationships with physicians that refer Medicare patients to their respective hospitals and such physicians referred Medicare patients to such hospitals. The HMA Hospitals rendered services to such patients and sought and received payment for such services from Medicare.

159.   At all times relevant hereto, HMA and the HMA Hospitals certified to the Government in their Hospital Cost Reports that they had complied with all federal laws and statutes. Those certifications were false because Defendants had, in fact, violated federal laws and statutes including Stark and Anti-Kickback Statutes through the fraudulent schemes described above, billing the Government for the services rendered to patients obtained by illegal referrals from the physicians identified herein, making false statements to obtain payments from the Government, accepting payment from the Government for the false claims and failing to timely report to the Government when improprieties were brought to their attention.

160.   All Medicare claims for patients referred by the physicians identified herein and which were supported by the false and fraudulent certifications were claims which the Defendants, under law, were not entitled to collect from the Government. All Medicare

ISICOFF, RAGATZ & KOENIGSBERG,  1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

reimbursements which Defendants collected that were supported by the submission of such false cost reports and false certifications were unlawfully collected. The Government was damaged by the payment of such claims in an amount equal to the total amount of such payments. The United States has additionally been damaged to the extent of the cost of its investigations into the conduct of Defendants.

161.    In addition, the United States is entitled to recover a civil penalty of not less than $5,500.00 nor more than $11,000.00 for each Medicare claim supported by the submission of such false certifications.

## COUNT I
## PRESENTATION OF FALSE CLAIMS

162.    Relator realleges and incorporates herein by reference paragraphs 1 through 161 as if fully set forth herein.

163.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients (1) unlawfully referred to HMA facilities by physicians to whom Defendants provided kickbacks and/or illegal remuneration and/or with whom Defendants entered into prohibited financial relationships in violation of the Anti-Kickback Statute and/or Stark, and (2) unlawfully classified as inpatients when they did not meet the requisite criteria.

164.    By virtue of the false or fraudulent claims made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

ISICOFF, RAGATZ & KOENIGSBERG, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131 Tel: 305.373.3232, Fax: 305.373.3233

## COUNT II
## MAKING OR USING FALSE RECORD OR STATEMENT
## TO CAUSE CLAIM TO BE PAID

165.    Relator realleges and incorporates herein by reference paragraphs 1 through 161 as if fully set forth herein.

166.    Defendants knowingly made, used, or caused to be made or used, false records or statements - - *i.e.,* the false express or implied certifications of compliance and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendants in submitting cost reports and requests for reimbursement - - to get false or fraudulent claims paid or approved by the Government.

167.    By virtue of the false records or false statements made by the Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

## COUNT III
## MAKING OR USING A FALSE RECORD OR STATEMENT
## TO AVOID AN OBLIGATION OR REFUND

168.    Relator realleges and incorporates herein by reference paragraphs 1 through 161 as if fully set forth herein.

169.    Defendants knowingly made, used, or caused to be made or used, false records or statements - - *i.e.,* the false express or implied certifications of compliance and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendants in submitting cost reports and requests for reimbursement - - to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

49

170.    By virtue of the false records or false statements made by the Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

**COUNT IV**
**CONSPIRING TO SUBMIT FALSE CLAIMS**

171.    Relator realleges and incorporates herein by reference paragraphs 1 through 161 as if fully set forth herein.

172.    HMA entered into agreements with each of the HMA Hospitals named as Defendants herein and conspired to defraud the Government by submitting false or fraudulent claims for reimbursement from the Government for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3). As part of the schemes and agreements to obtain reimbursement from the Government in violation of federal laws, Defendants conspired to provide illegal remuneration to physicians and engage in prohibited financial relationships in violation of the Anti-Kickback Statute and/or Stark, to misrepresent the status of patients for purpose of obtaining higher payments to which they were not entitled and to cause the Government to pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services whereas they were not so provided.

173.    By virtue of the Defendants' conspiracy to defraud the Government, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

WHEREFORE, Relator prays that judgment be entered in favor of the Government and Relator and against the Defendants on each of the claims set forth herein for the amount of the

50

Government's damages, trebled as required by law, and such civil penalties as are required by law, together with attorneys' fees, costs, pre-judgment interest and post-judgment interest, and for such other relief as may be just and proper, including without limitation, the statutory and equitable relief to which Relator is entitled and including Relator's remedies and damages under 31 U.S.C. § 3730(h). In the event that the United States takes over this action, Relator requests that he be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of these claims. Alternatively, in the event the Government does not proceed with this action, Relator requests that he be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or settlement.

## DEMAND FOR JURY TRIAL

A trial by jury is demanded in this case.

Respectfully submitted,

ISICOFF, RAGATZ & KOENIGSBERG
1200 Brickell Avenue, Suite 1200
Miami, Florida 33131
Tel:     (305) 373-3232
Fax:     (305) 373-3233

By: _____
Eric D. Isicoff
Florida Bar No. 372201

By: _____
Teresa Ragatz
Florida Bar No. 545170

51